IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 24-CR-4068-LTS-KEM-2 |
| vs. | **REPORT AND RECOMMENDATION** |
| ERIKA JO THELEN, | |
| Defendant. | |

Defendant Erika Jo Thelen moves to suppress evidence seized from her person after a pretextual traffic stop. Docs. 46, 58, 65, 71. She argues that officers lacked reasonable suspicion for the initial stop based on no license plates, since she had a temporary paper plate displayed in the rear window. She also challenges the reliability of the subsequent drug K-9 sniff and indication. The Government resists. Docs. 64, 72.

I held an evidentiary hearing on April 22, 2025. Doc. 69. At the hearing, the following witnesses testified:

- Detective Christopher Thomas, Sioux City Police Department;
- Officer Dyllon Frederickson, Sioux City Police Department;
- K-9 Officer Julian Hansen, Sioux City Police Department;
- Officer Briann Church, Sioux City Police Department;
- Sergeant Josh Tyler, Sioux City Police Department;
- Andrew Klein, K-9 expert for the Government; and
- Michael Gould, K-9 expert for the defense.

I also admitted the following exhibits into evidence:

- **Exhibit A** (Doc. 46-2) – Video clip of initial traffic stop from Officer Frederickson's body camera;
- **Exhibits B and G** (Docs. 46-3, 59-2) – Video clips of K-9 sniff from Officer Hansen's muted body camera (Exhibit G starts later than Exhibit B but extends for roughly 30 extra seconds);

- **Exhibits C and F** (Doc. 46-4, 59-1) – Video clips of initial traffic stop and K-9 sniff from Officer Frederickson's dash camera (Exhibit F is shorter than and entirely duplicative of Exhibit C);
- **Exhibit D** (Doc. 46-5) – Sioux City Police Task Force Officer Robert Johnson's police report;
- **Exhibits E-1, E-2, and K** (Docs. 46-6, 46-7, 59-9) – Certifications for K-9 Gino;
- **Exhibit H** (Doc. 59-3) – Video clip of K-9 sniff from Sioux City Police Officer Kameron Gugat's dash camera;
- **Exhibits I-1, I-2, I-3, and I-4** (Docs. 59-4 to 59-7) – Training records for K-9 Gino;
- **Exhibit J** (Doc. 59-8) – Training summary for K-9 Gino;
- **Exhibits L-1, L-2, and L-3** (Docs. 59-10 to 59-12) – Deployment records for K-9 Gino;
- **Exhibit M** (Doc. 59-13) – Defense counsel spreadsheet based on K-9 Gino's deployment records;
- **Exhibit N** (Doc. 59-14) – Sioux City Police Department K-9 policy;
- **Exhibit O** (Doc. 59-15) – Defense expert report;
- **Exhibits O-A and O-B** (Docs. 59-16, 59-17) – Defense expert resume;
- **Exhibit O-C** (Doc. 59-18) – Defense expert fee schedule;
- **Exhibits O-D and O-E** (Docs. 59-19, 59-20) – Video clips of defense expert demonstration with non-K-9 dog;
- **Exhibit 1** (Doc. 68-1) – Government expert resume;
- **Exhibit 2** (Doc. 68-2) – Government expert changes to defense spreadsheet based on K-9 Gino's deployment records (Exhibit M);
- **Exhibit 3** (Doc. 68-3) – Government expert report;
- **Exhibit 4** (Doc. 69) – Video clip of search of Defendant's person incident to arrest from Officer Church's body camera; and
- **Exhibit 5** (Doc. 69) – Video clip from Officer Frederickson's body camera after K-9 sniff and car search where officers confront Defendant with found drug paraphernalia, suspended license, and invalid plates, and arrest and search her.

At the hearing, the parties agreed to allow the Government to submit additional exhibits after the hearing:

- **Exhibit 6** (Doc. 70-1) – Government expert summary of Officer Hansen and K-9 Gino's certification tests; and

2

- **Exhibit 7** (Doc. 70-2) – Dogs for Law Enforcement bylaws and certification rules.

I recommend **GRANTING** the motion to suppress.

### I. BACKGROUND[1]

Detective Thomas works for the Special Investigations Unit, investigating drug, firearm, and gang activity. He had "received intel"[2] that drug trafficking was occurring at a particular address where Todd Babb resided; law enforcement knew Babb had previously been convicted of drug trafficking. Detective Thomas routinely drove by the residence and conducted surveillance. Over the course of several months, he saw large amounts of traffic (up to twenty distinct vehicles) visit the residence. When officers looked up the registration information for those vehicles, many of the owners were connected to drug activity (either by their criminal history or contact with police). In May 2024, Detective Thomas was personally involved in the arrest of an individual outside of the residence who possessed an ounce of methamphetamine.

Detective Thomas drove by the house late in the evening of August 6, 2024 (around 11:45 or 11:50 p.m.), and saw a vehicle parked at the residence that he had never seen there before. He did not see the vehicle arrive and did not know how long it had been at the residence. As he drove by, he noted the vehicle did not have front or back license plates, which he believed provided probable cause to stop the vehicle once it went mobile. At the hearing, when raised by counsel for the Government, he acknowledged Iowa's laws on temporary plates. He denied seeing any temporary tags but did not testify to making any effort to try to discern if the car had temporary tags. Detective Thomas

---

[1] The facts in the background section are taken from the testimony at the suppression hearing unless otherwise noted.

[2] The Government used this phrasing via a leading question, and neither party elicited any further specifics about this intel.

3

testified that Iowa law required a temporary tag to be clearly visible and suggested that there was probable cause to stop a vehicle with temporary plates to verify their validity when the information on the temporary tag could not be read. He agreed that it was often difficult to read a temporary tag due to window tint, time of day, or the cleanliness of a vehicle. Officer Church, who also testified at the suppression hearing but was not involved in the traffic stop, testified to a similar view of the law; based on her training and experience, an officer could perform a stop to confirm the validity of a temporary tag without any reason to suspect fraud.

Detective Thomas drove by the residence multiple times (he could not recall the number) and saw the vehicle leaving the residence shortly after midnight (12:05 a.m.).[3] He requested that a patrol car conduct a probable-cause stop, describing the vehicle as a black Jeep Compass without license plates. Officer Frederickson performed the stop. Officer Frederickson testified that he pulled the vehicle over because it did not have license plates. Officer Frederickson's dash camera video shows the Jeep pass by going in the opposite direction, at which point Officer Frederickson saw that it did not have a front license plate. Ex. C at 00:08-00:13. Officer Frederickson performed a U-turn. *Id.* at 00:18-00:21. When he first turned around, the Jeep was at least 100 feet away, too far to be able to see whether it had temporary tags. *Id.* at 00:22. The Jeep signaled to turn into a fast food restaurant parking lot with the patrol vehicle still a good distance away. *Id.* at 00:34. As the Jeep braked to turn, Officer Frederickson closed the gap between the vehicles to within several car lengths. *Id.* at 00:39-00:42. He activated his emergency lights to initiate the traffic stop. *Id.* at 00:44.[4] Officer Frederickson did not

---

[3] He did not see Thelen exit the house and enter the vehicle; rather, he saw the vehicle when it was about a half block away from the residence.

[4] Officer Frederickson testified that the Jeep had already signaled that it was turning into the parking lot when he activated his lights, and the flash of the emergency lights can be seen on the dash camera video beginning at 00:44.

4

appear to make any effort to see if the Jeep had a temporary tag, activating his lights almost immediately when he neared the Jeep.

Officer Frederickson testified that he did not see a (potential) temporary license plate in the Jeep's rear window until the Jeep was nearly stopped.[5] *See also id.* at 00:57 (temporary tag visible on dash camera video). Even then, he testified that he could see only what appeared to be a rectangular piece of paper; he could not see any words or information. He testified that he had experience with people putting blank pieces of notebook paper in their rear windows to mimic temporary plates. He acknowledged, however, that it did not look like a piece of notebook paper and was consistent in size and shape with a state-issued temporary plate. He testified that because all he could see was a rectangular piece of paper, he had no idea whether it was a temporary plate or something else. But he could point to no particularized reason to think it was anything other than a valid temporary plate. He denied the ability to stop a car for a compliance check any time it displayed a temporary tag. When defense counsel asked for factors to consider before stopping a car based on a temporary tag, he responded that he "ha[d] to be able to see at the very least that it [*was*] a temporary tag" (as opposed to something else displayed in the back window in the same manner as a temporary tag). He acknowledged that it was not unusual to be unable to see the information on a temporary tag based on lighting, window tint, and the vehicle's cleanliness.

Officer Frederickson exited the patrol vehicle and walked toward the Jeep. As he got closer, he saw that the rectangular piece of paper appeared to be a paper license plate. He could not read it, however, until he looked closely at it with his flashlight. It did not display a date, so he did not believe it was a valid temporary plate.

---

[5] The parking lot was well lit, but the street had also been well lit. The difference in Officer Frederickson's ability to see the temporary plate appears to be the nearness of his patrol vehicle to the Jeep.

5

Officer Frederickson approached the driver's side window. The driver, Defendant Thelen, was the only person in the Jeep; Thelen's dog was also present. Officer Frederickson told Thelen he stopped her vehicle because she did not have license plates. He asked for her license, insurance, and registration or a bill of sale. She produced a license, but no proof of insurance or registration. Thelen said that she had recently purchased the vehicle and would try to contact the seller for a bill of sale.

Other officers arrived on scene, including Officer Church, Officer Gugat, and K-9 Officer Hansen. Officers asked Thelen to exit the Jeep so Officer Hansen could conduct a drug dog sniff with K-9 Gino. Officer Hansen led Gino around the Jeep in a counter-clockwise direction, tapping the side of the vehicle with his hand to direct Gino to smell the vehicle.[6] When he had completed a full circle, he turned to lead Gino in a clockwise direction, consistent with his training. He turned Gino around in between the driver's side front and passenger doors. Shortly after turning around, Gino stopped and stared at the open driver's window. Officer Hansen testified that Gino indicates by stopping and staring at the source of the odor (his trained final response). I credit Officer Hansen's testimony that Gino slowed and stopped while Officer Hansen continued walking. I also credit Officer Hansen's testimony that he is able to see a change of behavior on the video exhibit—Gino's head shooting up—that he did not see in real time, but which further supports that Gino smelled narcotics in the Jeep.

Officers searched the Jeep based on Gino's positive indication. They found a methamphetamine pipe in the center console. Officer Frederickson, Officer Gugat, and Officer Church spoke with Thelen.[7] Officer Frederickson asked if Thelen knew that her driver's license was suspended. Thelen initially acted dumbfounded, then provided a

---

[6] Facts in this paragraph are taken from the testimony at the suppression hearing and the video exhibits of the dog sniff. *See* Ex. B, C, G, H.

[7] The facts in this paragraph are largely taken from Exhibit 5 (Officer Frederickson's body camera video).

long excuse involving a traffic ticket in 2022 that prosecutors dropped but that still appeared active in the system. Officer Frederickson told Thelen that the State of South Dakota suspended her license in 2023 and that she should not be driving until she called and resolved the issue. He said ultimately, her suspended license was low on the totem pole of things they were worried about. Thelen asked if she could ask someone to come and get her car. Officer Frederickson said, "Yeah, absolutely," and Officer Gugat interjected, "Hold off on that. Eventually we'll get there, okay?" Govt. Ex. 5 at 00:19:55.[8] Officer Gugat said there was a lot going on. Officer Frederickson told Thelen that a drug dog had positively indicated on her vehicle and that drug paraphernalia (a methamphetamine pipe) had been found in her car. Officer Frederickson said that Officer Church was going to search Thelen's person. Thelen asked what gave law enforcement the authority to search her person, arguing with law enforcement that she had dealer plates, which did not require a date (Officer Frederickson said she had an "in transit tag that you can't see" with no date on it). Officer Frederickson said that Thelen was under arrest for possessing drug paraphernalia and that Officer Church would search her person incident to arrest; Officer Frederickson then said Thelen was being arrested for drug paraphernalia and driving while suspended. Officer Church found a pound of methamphetamine on Thelen's person. She read Thelen her *Miranda* rights and handcuffed her. At the jail, Thelen was booked on drug charges (possession of drug paraphernalia, possession of methamphetamine with intent to distribute, and a tax stamp violation).

At the hearing, Officer Frederickson testified that if the K-9 had not positively indicated, he would not have arrested Thelen for traffic violations such as driving with a suspended license, lack of insurance, or improper registration. He acknowledged,

---

[8] Time markers refer to the time stamps on the video (reflecting the time of day), rather than the time on the media player (reflecting the length of the video).

however, that he would have done whatever Detective Thomas and the Special Investigations Unit asked of him. Detective Thomas was not on the scene. The Government elicited no testimony from Detective Thomas or any other officer suggesting a plan to arrest Thelen no matter what if there was probable cause to do so.

Both parties presented expert witnesses on the dog sniff. Officer Hansen and K-9 Gino had been certified to detect methamphetamine, cocaine, heroin, and ecstasy (not fentanyl or marijuana) by Dogs for Law Enforcement. The defense expert, Michael Gould, testified that there are only two "nationally recognized" certification organizations, and Dogs for Law Enforcement is not one of them, as it operates in only five to six states rather than nationwide. He stated he did not know what standards Dogs for Law Enforcement used to certify its dogs. He called K-9 Gino's trained final response into question, as a stop-and-stare is instinctual and more subjective than an indication like sitting. He stated that the video showed K-9 Gino panting, during which time he could not have been sniffing with his nose. He testified that Officer Hansen inadvertently cued K-9 Gino to indicate when he turned K-9 Gino around. He illustrated this point by "recreating" the drug dog sniff in this case with a doggy acquaintance (not a certified K-9). *See* Def. Ex. O-D and O-E. He testified that he had not had much time to review K-9 Gino's training and deployment records, as they were provided to him during a holiday weekend a few days before the hearing (defense counsel submitted these records to the court a month and a half before the hearing, so Defendant, rather than the Government, is responsible for the delay). The defense expert said he reviewed all the records, but they were hard to interpret, did not include videos (which he recommended for training), and showed some false positives.

The Government expert, Andrew Klein, is certified to train K-9s by Dogs for Law Enforcement. He did not train K-9 Gino originally, but he has recertified K-9 Gino as a drug detection dog several times with Officer Hansen and at least once with Gino's prior handler (by the time Klein began working with K-9 Gino, his trained final response was

8

already the stop-and-stare).  He testified that Officer Hansen conducted the dog sniff in this case consistent with his training (going counterclockwise then clockwise) and that K-9 Gino's indication here looked similar to the indications K-9 Gino provided during the certification process.  He testified that K-9 Gino did not always indicate in training after being turned, so he did not believe the turn subconsciously cued K-9 Gino to indicate.  Like Officer Hansen, he testified that when watching video of the sniff at a reduced speed (25%), he noticed K-9 Gino sniffing near the open driver's side window *before* Officer Hansen turned the dog around to change directions.

Defense counsel prepared a spreadsheet summarizing K-9 Gino's deployment records and concluding that when K-9 Gino indicated in the field, drugs were subsequently found only 55% of the time.  Doc. 59-13.  Klein challenged this calculation, pointing to purported mistakes by defense counsel such that the accuracy rate of a trained final response should have been 65%.  Doc. 68-2.  Klein also challenged defense counsel's methodology, noting defense counsel did not consider times that K-9 Gino did not alert in the field—out of 133 deployments, K-9 Gino did not indicate 29 times (22%).  Klein noted that K-9 Gino's failure to indicate at times demonstrated that he did not automatically provide a trained final response in order to receive a treat, no matter what he smelled (as defense expert opined).  Klein argued that when determining K-9 Gino's accuracy rate, deployments where K-9 Gino did not alert should be considered, making Gino 76% reliable in the field.  In any event, Klein and Officer Hansen both testified that training records provided better evidence of a dog's reliability than deployment records.  Training occurs in a controlled environment; in the field, when drugs were not found after a positive indication, it was unclear whether the K-9 gave a "false positive" or whether the K-9 was smelling residual odors from drugs in the car at an earlier time or drugs so well hidden they were never recovered by law enforcement.

Thelen argues that law enforcement did not have probable cause or reasonable suspicion for the initial traffic stop.  She also argues that the drug dog sniff did not

9

provide probable cause to search the Jeep. She seeks to suppress the methamphetamine pipe, methamphetamine found on her person, and her statements at the scene as fruit of the poisonous tree. The Government responds that the methamphetamine should not be suppressed under the inevitable-discovery doctrine. The Government argues that even if Thelen's car had not been searched after a positive drug dog sniff, the methamphetamine would still have been discovered during a search incident to arrest when Thelen was arrested for driving with a suspended license.

## II. DISCUSSION

The Fourth Amendment protects people "against unreasonable searches and seizures."[9] "A traffic stop is a seizure and 'must be supported by reasonable suspicion or probable cause.'"[10]

> "A reasonable suspicion is a 'particularized and objective' basis for suspecting criminal activity by the person who is stopped." Reasonable suspicion is determined by "looking at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing based on his own experience and specialized training to make inferences from and deductions about the cumulative information available." "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard."[11]

---

[9] **U.S. Const. amend IV**.

[10] *United States v. Martin*, 15 F.4th 878, 881 (8th Cir. 2021) (quoting *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008)).

[11] *Id.* at 882 (cleaned up) (quoting *United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005); *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015)).

"A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."[12] The Fourth Amendment does not prohibit pretextual stops; as long as an officer has "reasonable suspicion or probable cause to stop for a traffic violation, 'any ulterior motivation on the officer's part is irrelevant.'"[13] The Government bears the burden of proof.[14]

Officer Frederickson testified that he stopped Thelen because her vehicle did not have front or rear license plates. Generally, Iowa law requires that vehicles display front and rear[15] metal[16] plates in a "clearly visible" position and be maintained free of debris so they are "clearly legible,"[17] with the rear plate illuminated so that it is "clearly legible from" fifty feet away.[18] These rules do not apply, however, to newly purchased vehicles, which may instead display a temporary "card" (provided by the state) "on the rear of the vehicle" for forty-five days; the card must be "plainly stamped or stenciled" with the dealer's registration number and date of the vehicle's delivery.[19]

Neither Officer Frederickson nor Officer Thomas testified to making any attempt to see whether the vehicle had a temporary tag. There is no evidence Officer Thomas even looked at the rear window. And Officer Frederickson initiated the stop as soon as he neared the vehicle; he did not follow the vehicle closely for any amount of time to see

---

[12] *United States v. Sanchez,* 572 F.3d 475, 479 (8th Cir. 2009) (quoting *Arvizu*, 534 U.S. at 277).

[13] *United States v. McLemore*, 887 F.3d 861, 864 (8th Cir. 2018) (quoting *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016)).

[14] *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003).

[15] **Iowa Code § 321.37(1)**.

[16] **Iowa Code § 321.166(1)(a), (4)** (also requiring plates "be of sufficient size to be readable from" 100 feet away during daylight).

[17] **Iowa Code § 321.38**.

[18] **Iowa Code § 321.388**.

[19] **Iowa Code § 321.25**.

whether a temporary tag was visible when he was not 100 feet away. If he had, he likely would have seen that Thelen's rear window displayed a rectangular piece of paper consistent in size and shape with a temporary license plate—since he was in fact able to see this from his patrol vehicle when he finally got close to Thelen's vehicle after initiating the stop.

Reading between the lines of the testimony at the suppression hearing, it appears to the court that Sioux City police officers may be trained that they can perform a traffic stop any time they are unable to read the information on a temporary tag. It seems the officers understood Iowa law to require them to be able to see and read a temporary tag from some distance away. Thus, once he closed the gap between their vehicles, Officer Frederickson made no effort to see if Thelen's vehicle had a temporary tag, because even if it did, he believed it violated Iowa law by not being clearly visible.

Iowa law requires license plates to be clearly legible and visible, but temporary tags are not defined as plates subject to these requirements—the Iowa statute on temporary tags says a vehicle may be operated "without registration plates" (meaning temporary tags are not registration plates).[20] This tracks as a matter of common sense. If a temporary paper tag were displayed on the vehicle's bumper in the spot normally used for a metal plate, allowing it to be illuminated so that it could be read from a distance at night, it would likely disintegrate; a paper tag is not going to withstand weather.[21] It would also be illogical to require a new vehicle owner to construct a light "to illuminate the rear window of a vehicle" when "most temporary tags are just that—temporary."[22]

---

[20] **Iowa Code § 321.25(1)**; *see also **United States v. Givens***, 763 F.3d 987, 990 (8th Cir. 2014) (noting temporary tags are "an exception" to the statute requiring plates to be "clearly visible" and kept clean enough to be "clearly legible").

[21] *See **United States v. Ruiz-Lopez***, No. 05-40060-01-JAR, 2006 WL 1128702, at *4 (D. Kan. Apr. 26, 2006).

[22] *Id.* at *5.

In addition, here, the officers' testimony supports that temporary tags in Iowa are commonly displayed in a vehicle's rear window and that it is not unusual to be unable to read a temporary tag due to the time of day, weather, window tint, or dirty windows. This is not a case where the officer's inability to see the tag was within the driver's control—for example, due to a dirty window or the placement of the tag.

The Eighth Circuit has had several occasions to address an officer's ability to pull a vehicle over based on the inability to read information on a temporary license plate. In *Sanchez*, the court upheld a stop when the officer saw a temporary tag stating the make and year of the vehicle, the date, and a registration number, which the officer suspected was fraudulent because "no issuing jurisdiction was identifiable" (he could not see that at the bottom, in much smaller type, the tag read, "Arizona Temporary Registration Plate").[23] The court held "it was objectively reasonable for [the officer] to expect that the name of the issuing jurisdiction would appear conspicuously on the face of an official document, and to investigate further [when] a name was not visible."[24] In *Mendoza*, the court upheld a temporary-tag stop because the officer "gave particularized reasons why she suspected that this particular [temporary] tag may have been fraudulently created"— it had blue bars, not the red swirl design used on Iowa's temporary tags; it looked like something a person could make "on a printer rather than issued by an official authority"; and the expiration date was handwritten in block letters, which would be easy to alter.[25] And in *Givens*, the court upheld a traffic stop based on the officer's ability to "see what

---

[23] *United States v. Sanchez,* 572 F.3d 475, 476-77, 479 (8th Cir. 2009).

[24] *Id.* at 479.

[25] *United States v. Mendoza,* 691 F.3d 954, 956-57, 959 (8th Cir. 2012). The court in *Givens* described *Mendoza* as upholding "a traffic stop under conditions where a vehicle did not display a metal license plate and the officer saw only what appeared to be a paper tag posted in the rear window, but did not know whether the paper affixed to the window was a valid registration tag." *United States v. Givens*, 763 F.3d 987, 991 (8th Cir. 2014). This is dicta, and the holding in *Clinton* (discussed below) rejects this basis for distinguishing *Mendoza*.

appeared to be a temporary paper registration card in the rear window" without being able to read it.[26] Importantly, the court held "it was objectively reasonable for [the officer] to expect that a properly displayed valid registration card would be readable from his location" based on the officer's testimony that "[i]n his experience, temporary registration cards [we]re generally legible when observed from his patrol car" and that he had previously "been able to read temporary registration cards at nighttime."[27]

On the other hand, in *McLemore*, the Eighth Circuit rejected that the officer's "inability to read the temporary registration card from her police cruiser . . . , without more," provided reasonable suspicion for a stop (under Iowa law).[28] In *McLemore*, the officer wanted to make a pretextual stop.[29] She saw that the vehicle had a "dealer advertising plate instead of a rear [metal] license plate . . . and a temporary paper card taped to the inside of the left rear window."[30] The court held that the officer's inability to read any of the information on the temporary tag did not provide reasonable suspicion for a stop, noting that the officer did not identify particular facts that made her think the temporary tag was fraudulent (as in *Sanchez* and *Mendoza*).[31] The court distinguished *Givens* because no officer testified that they "can usually read temporary cards at night or that they had previous problems with fraudulent or invalid cards."[32] Similarly, in *Clinton v. Garrett*, the Eighth Circuit held officers did not have a "particularized basis for suspecting" a violation of Iowa's license plate law when officers saw a vehicle with a "white piece of paper taped in the back window" (they could not tell whether it was

---

[26] *Givens*, 763 F.3d at 991.

[27] *Id.*

[28] *United States v. McLemore*, 887 F.3d 861, 865 (8th Cir. 2018).

[29] *Id.* at 863.

[30] *Id.*

[31] *Id.* at 866.

[32] *Id.*

14

blank or had any writing on it because of the glare from the sun), as well as a dealer advertisement in the place a metal license plate is normally mounted.[33] As in *Givens*, the officer testified "about his previous experiences with drivers placing counterfeit or blank documents in the windows of unregistered vehicles to mimic temporary registration tags"; unlike in *Givens*, the officer did not testify that he was "usually able to" read a valid tag "under similar circumstances."[34]

The Eighth Circuit cases make "clear" that officers "must have particularized facts" to support "their suspicion that [a temporary] tag was falsified";[35] "the Fourth Amendment does not permit random 'spot checks'" to ensure a temporary tag's validity, without more.[36] "Nor can a driver rightly be held responsible for ambient conditions that render a tag illegible."[37] To the extent law enforcement here believed Thelen's temporary tag violated Iowa law requiring it to be "clearly legible" or "clearly visible," that belief was not objectively reasonable.[38]

A traffic stop based on an officer's mistake of law or mistake of fact will be upheld if the mistake was "objectively reasonable."[39] The Eighth Circuit has upheld traffic stops

---

[33] *Clinton v. Garrett*, 49 F.4th 1132, 1136-37, 1141 (8th Cir. 2022).

[34] *Id.* at 1137, 1143.

[35] I do not think that the important distinguishing factor in *McLemore* and *Clinton* was the dealer advertisement in place of a rear license plate (instead of a blank space).

[36] *Id.* at 1141, 1143 (quoting *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

[37] *Clinton*, 49 F.4th at 1143.

[38] *McLemore*, 887 F.3d at 867 (rejecting argument that officer "was acting under an objectively reasonable mistake of law in believing that her inability to read the [temporary] card was a violation of Iowa law" because "(a) it is not reasonable to construe the requirement of 'plainly stamped or stenciled' information in § 321.25 as meaning information that can be read from a pursuing officer's police cruiser; and (b) the Iowa Court of Appeals decision in [*State v.*] *Carmody*[, No. 13-0237, 2013 WL 5949621 (Iowa Ct. App. Nov. 6, 2013),] is directly contrary authority").

[39] *United States v. Hollins*, 685 F.3d 703, 705 (8th Cir. 2012).

15

based on a registration violation (no license plates), despite the vehicle's temporary tag, when the officer "reasonably believed that the [vehicle] had neither license plates nor [a temporary] sticker."[40] Here, however, Officer Frederickson did not "take[] reasonable measures to observe the vehicle from [a] vantage point"[41] that might allow him to see whether it had a temporary tag. It was not objectively reasonable for Officer Frederickson to believe the vehicle violated Iowa's registration laws simply because it did not have metal license plates, without looking for a temporary tag. Temporary tags are common. Although the existence of reasonable suspicion does not require law enforcement to rule out every possible innocent explanation, the officers' actions here would allow law enforcement to stop anyone with a temporary tag, by being willfully

---

[40] *United States v. Hollins*, No. 8:10CR447, 2011 WL 2161350, at *3 (D. Neb. Apr. 8, 2011), *report and recommendation adopted,* 2011 WL 2161357 (June 2, 2011), *aff'd,* 685 F.3d 703; *see also* *United States v. Bueno*, 443 F.3d 1017, 1020, 1024 (8th Cir. 2006) (officers stopped vehicle because it "was lacking license plates and because the officers could not observe a temporary vehicle registration affixed to the vehicle"; the court generally noted the "officers' actions were reasonable" and that they "could not see the temporary registration" until after stopping the vehicle); *United States v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000) (upholding stop based on lack of license plates when "the dark tint of the rear window prevented the deputy from seeing the temporary registration application"); *see also* *United States v. Payne*, 534 F.3d 948, 950-51 (8th Cir. 2008) (holding that it was objectively reasonable for officer to think the vehicle did not have a front license plate because the plate "was not centered on the vehicle's front bumper in the usual manner and it was dark outside, making it difficult for [the officer] to fully scan the vehicle for [the] front license plate" "attached with wire to the passenger side of the grille"); *United States v. Flores-Sandoval*, 366 F.3d 961, 962-63 (8th Cir. 2004) (holding that it was objectively reasonable for officer to believe vehicle registered in California did not have a front license plate as required by California law when the officer saw via his rearview mirror an empty plate bracket and no reflection of light from a license plate, his standard practice for determining if a vehicle had a front license plate).

[41] *Sanchez*, 572 F.3d at 479 (discussing *United States v. Smart*, 393 F.3d 767 (8th Cir. 2005), where the court found the officer had a reasonable suspicion that the vehicle's lack of a front license plate violated the law, when the officer could not see the issuing state for the rear license plate (but was in a state where all neighboring states required front license plates) (ultimately, the vehicle was registered in a state that did not require front license plates)).

blind to their existence.[42] Eighth Circuit caselaw shows that the Fourth Amendment does not allow a traffic stop simply because a vehicle has a temporary tag. Here, considering "the conditions under which the officer first observed [defendant's] car—*e.g.*, how far away the police cruiser was from [defendant's] car at the time the officer first observed the tags, the quality of the lighting, how quickly [the defendant's] car was moving, etc.—" it was not objectively reasonable for Officer Frederickson to believe the vehicle violated Iowa's registration laws.[43] His "mistake" of fact—that the vehicle displayed no temporary tag in its rear windshield—was not objectively reasonable.[44] I therefore recommend finding that the pretextual reason for the traffic stop—the vehicle's lack of license plates—did not provide reasonable suspicion for the stop.

The Government does not argue that reasonable suspicion existed based on Thelen's contact with the drug house. The evidence is therefore sparse on how officers originally found out about the drug house (did a confidential informant provide information? did another officer simply suspect drug dealing because of Babb's prior convictions and the traffic at the house?). In addition, officers did not know whether Thelen visited the drug house briefly or whether she left carrying a bag—i.e., they did not know whether her visit was consistent with drug trafficking as opposed to a social

---

[42] *United States v. Wise*, 418 F. Supp. 2d 1100, 1106 (S.D. Iowa 2006) (holding that "it was not objectively reasonable for [the officer] to believe that the [car] was traveling without license plates" for a pretextual stop, when the officer "willfully ignored making observations that would have avoided the stop" (by failing to look for a temporary tag); the officer additionally knew that a different officer had stopped the car earlier in the day, and the court reasoned the car's earlier release suggested it was properly registered).

[43] *United States v. Hill*, 131 F.3d 1056, 1060 (D.C. Cir. 1997) (remanding for further development of the record when district court credited officer's testimony that temporary tags did not have a VIN number but did not address whether this mistake was objectively reasonable).

[44] I find that Officer Frederickson was acting in good faith and was not purposefully trying to avoid seeing the temporary tag; rather, it seems he did not believe he needed to look for a temporary tag due to his (objectively unreasonable) understanding of Iowa law.

17

visit.[45] The Government has not shown reasonable suspicion Thelen was involved in the drug trade,[46] and it has also forfeited this argument.[47]

Neither does the Government make any argument that an exception to the exclusionary rule applies to the initial stop.[48] Again, I find the Government has therefore forfeited this argument.[49]

---

[45] *Cf. United States v. Collins*, 883 F.3d 1029, 1031, 1033 (8th Cir. 2018) (per curiam) (reasonable suspicion existed to stop defendant based on defendant's ten-to-fifteen minute visit at 4:30 a.m. to a known drug house).

[46] *See United States v. Forjan*, 66 F.4th 739, 748 (8th Cir. 2023) (Judge Shepherd's non-majority opinion found that officers did not have reasonable suspicion to stop defendant based on his forty-five-minute visit to a suspected drug house, which the officer "testified is longer than the duration of a typical drug transaction"); *id.* at 755 (Grasz, J. dissenting) (agreeing with portion of Judge Shepherd's opinion addressing reasonable suspicion); *cf. id.* at 754-55 (Colloton, J., concurring in the judgment) (finding reasonable suspicion existed because defendant left his vehicle's headlights on, suggesting he "planned to stay only a short time and was not, say, a guest attending a sit-down dinner or settling in to watch a two-hour basketball game"; and based on officer testimony "that larger drug transactions take more time than small deals, because the parties have more drugs to weigh and more cash to count").

[47] *See United States v. Jones*, 565 U.S. 400, 413 (2012); *United States v. Demilia*, 771 F.3d 1051, 1056 (8th Cir. 2014).

[48] The Government argues the inevitable-discovery doctrine saves the drug dog sniff.

[49] *See United States v. Ngumezi*, 980 F.3d 1285, 1290-91 (9th Cir. 2020) (holding that the government's failure to argue that the attenuation or inevitable-discovery doctrines applied "prevent[ed the court] from upholding the denial of the suppression motion on th[ose] theor[ies]," since it is the government's burden to show evidence is not fruit of the poisonous tree); *see also Forjan*, 66 F.4th at 749 (Judge Shepherd's non-majority opinion affirmed denial of suppression motion based on the attenuation doctrine, finding the driver's suspended license and lack of insurance, discovered during the traffic stop, was an intervening circumstance "wholly unconnected to the purposes of the stop—the mistaken belief [defendant's] tags were expired or the reasonable suspicion of drug activity"); *id.* at 755 (Grasz, J., dissenting) (would have held the attenuation doctrine did not apply); *United States v. Reeves*, No. 21 CR 50027-1, 2025 WL 71834, at *8-9 (N.D. Ill. Jan. 10, 2025) (holding that the attenuation doctrine applies when "the only information obtained during the encounter needed to act on the probable cause was the defendant's identity, which is not suppressible"; and that discovery of suspended license during unlawful encounter with defendant in the backseat of a parked car was therefore not an intervening circumstance for purposes of attenuation, since officers still "had to investigate to determine if [defendant] was *driving* on [the suspended license]"); *State v. Christian*, 445 P.3d

I recommend finding that the initial traffic stop violated the Fourth Amendment. I therefore recommend suppressing the methamphetamine pipe found in Thelen's car, the methamphetamine found on Thelen's person, and the statements Thelen made to officers on the scene.[50]

Because I find suppression appropriate based on the initial traffic stop, I need not address the K-9 search. I briefly note, however, that I credit Officer Hansen's and the government expert's description of the K-9 indication in this case over the defense expert's; the former are familiar with this particular dog and his behavior. I find that K-9 Gino positively indicated on the vehicle. K-9 Gino's reliability based on his history is a closer issue, although I agree with the Government that it is relevant that K-9 Gino does not always positively indicate in the field. I also agree that Gino's performance during controlled trainings would be a far better indicator of his reliability than considering his deployment records. Ultimately, however, I need not weigh in on the propriety of the dog sniff.[51]

### III. CONCLUSION

I recommend **GRANTING** Defendant Thelen's motion to suppress (Doc. 46).

---

183, 190-91 (Kan. 2019) (holding that a suspended license and lack of insurance discovered during an unlawful traffic stop was not an intervening circumstance for purposes of the attenuation doctrine, since officers have discretion to arrest for those offenses, unlike when they discover the existence of an arrest warrant).

[50] *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002) ("Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." (citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963))).

[51] I also do not need to address the Government's inevitable-discovery argument, although I note the Government did not elicit testimony at the hearing supporting that officers would have arrested Thelen for driving with a suspended license if K-9 Gino had not positively indicated on her car.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.[52] Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[53] Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[54]

**DATED** May 21, 2025.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[52] **LCrR 59**.

[53] *See* **Fed. R. Crim. P. 59**.

[54] *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).