# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

ERIKA JO THELEN,

        Defendant.

No.  CR24-4068-LTS

**MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION**

## I.     INTRODUCTION

This matter is before me on a Report and Recommendation (R&R) (Doc. 77) in which the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge, recommends that I grant defendant Erika Thelen's motion (Doc. 46) to suppress.  Both parties filed objections (Docs. 82, 85) to the R&R and Thelen filed a response (Doc. 86).

## II.     BACKGROUND

### A.     *Procedural History*

Thelen is charged in an indictment (Doc. 3) with one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  Her motion (Doc. 46) to suppress and supplement (Doc. 58) seek the exclusion of evidence stemming from a traffic stop and subsequent search of her vehicle and person.  The Government filed a resistance (Docs. 64, 64-1) and Thelen filed a reply (Doc. 65).

Judge Mahoney held an evidentiary hearing on April 22, 2025.  Doc. 69.  The Government called six witnesses, including a K-9 expert.  *Id.*  The defense called its own K-9 expert.  *Id.*  Judge Mahoney admitted five Government exhibits and 15 defense exhibits (including subparts) during the hearing, *id.*, as well as two Government exhibits

following the hearing (Docs. 70-1, 70-2). Thelen and the Government filed additional briefing (Docs. 71, 72) after the hearing. Judge Mahoney filed the R&R (Doc. 77) on May 21, 2025. Trial is scheduled to begin October 6, 2025. *See* Doc. 91.

## B. *Relevant Facts*

In the R&R, Judge Mahoney made detailed findings of fact based on the exhibits and testimony presented at the evidentiary hearing. Doc. 77 at 3-10. The parties have raised several objections to these findings, which I will address below. I incorporate the factual findings from the R&R herein (subject to the objections addressed below) and will discuss those facts as necessary to address the parties' objections.

## III. APPLICABLE STANDARDS

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although

2

there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).


## IV.    DISCUSSION

### A.    *Objections to Findings of Fact*

I will first address the parties' objections to the factual findings in the R&R. Doc. 85 at 2-8; Doc. 82. Then, I will address the Government's objection to Judge Mahoney's conclusion that the traffic stop was unlawful. Doc. 85 at 8-11.


#### 1.    *Government's Objections*

The Government raises nine objections to Judge Mahoney's factual findings. First, it argues that Judge Mahoney improperly characterized its response to Thelen's motion to suppress as relying exclusively on the inevitable discovery doctrine. Doc. 85 at 2 (citing Doc. 77 at 10). At the end of Judge Mahoney's discussion of the relevant facts, she briefly summarized the parties' arguments. Doc. 77 at 9-10. In discussing the Government's resistance to Thelen's motion, she wrote "[t]he Government responds that the methamphetamine should not be suppressed under the inevitable-discovery doctrine." Doc. 77 at 10. In this summary, Judge Mahoney did not mention the Government's other arguments – namely, that the traffic stop was lawful and a reliable K-9 alert supports denying Thelen's motion to suppress. *See* Doc. 85 at 2-3; *see generally* Doc. 64-1.

3

However, the court's summary of a party's argument is not a factual finding and therefore it is not a proper basis for objection. *See United States v. Wise*, 881 F.2d 970, 972 (11th Cir. 1989) ("Recitation of a party's argument is not a finding of fact[.]"); *see also Painter v. Atwood*, No. 2:12-CV-01215-JCM, 2014 WL 5469155, at *4 (D. Nev. Oct. 28, 2014) ("The court's summary of plaintiff's argument is not a finding of fact."). Thus, the Government's first factual objection is overruled.

Second, the Government requests clarification and further findings regarding Judge Mahoney's finding that K-9 Gino sniffed near the open driver's side window before Officer Hansen turned Gino around. Doc. 85 at 3-4. The Government asserts that both Hansen and Deputy Klein testified that Gino made a "head snap" or "head/nose raise" which they both stated was "indicative of an alert" prior to the K-9 being turned around. *Id.* at 4. Indeed, both Hansen and Klein made statements to that effect. *See* Doc. 74 at 82-83 (Hansen stating that "[Gino's] head shoots up once he's just before the C-pillar which would be the rear seam of the driver's side rear passenger door . . . and then as he turns around, he follows that scent back to the B-pillar. . ."); *see also id.* at 201, 203 (Klein testifying that "at the point where Officer Hansen decided to turn his dog, we see the dog's nose raise up towards the open window. . . The turn has nothing to do with" the nose-raising). Additionally, Officer Kameron Gugat's dash camera video shows Gino moving his head upward before he was turned around. Doc. 59-3, Ex. H at 00:18-00:19. Although the Government indicates that it objects to Judge Mahoney's factual finding, it does not contest any of her determinations but rather seeks to add information provided by Hansen, Klein and Exhibit H. The Government's second factual objection is sustained as it is supported by the record.

Third, the Government objects to Judge Mahoney's finding that there was no evidence of drug activity at Todd Babb's residence. Doc. 85 at 4. The Government contends that Detective Thomas testified that he had drug intel on the residence and observed several cars whose registration information showed a connection to drug activity. Doc. 85 at 4 (citing Doc. 74 at 26). Thelen contends that the Government

4

mischaracterized this finding, as Judge Mahoney acknowledged Thomas' testimony regarding the suspected drug dealing activities at the house. Doc. 86 at 1-2. Additionally, Thelen maintains that Judge Mahoney correctly concluded that there was scant evidence linking Thelen's car to the drug activity, as Thomas did not: (1) see when Thelen's car arrived, (2) know how long the car had been there, (3) recognize the car, (4) have previous contact with Thelen or (5) know if Thelen entered the house. Doc. 86 at 1. I agree with Thelen that the Government mischaracterized Judge Mahoney's finding. She found that Thomas "received intel" about drug trafficking occurring at Babb's residence over a period of several months. Doc. 77 at 3. Additionally, she acknowledged that Thomas monitored the cars parked outside the residence and noted that many of the car owners had connections to drug activity. *Id.* The Government's third factual objection is overruled.

Fourth, the Government objects to Judge Mahoney's finding that "this is not a case where the officers' inability to see the [temporary] tag was within the driver's control—for example, due to a dirty window or the placement of the tag." Doc. 85 at 4. The Government asserts that Thomas and Officer Fredrickson testified that their inability to see the temporary tag was due to a combination of factors, including darkness, limited lighting, the dirty condition of Thelen's window and the presence of dark rear window tint. *Id.* at 5. From the officers' testimony and Exhibit C, I agree with Judge Mahoney that the officers' inability to see the temporary tag was not Thelen's fault. It was dark outside, as it was after midnight. Although her back window appears tinted, there is no evidence this tint was illegal or otherwise not in compliance with Iowa law. Additionally, any dirt or dust on the back window did not inhibit the visibility of the temporary plate. Finally, Thelen's temporary plate was properly positioned. This objection is overruled.

The Government's fifth objection contests Judge Mahoney's conclusion that neither Thomas nor Frederickson made any effort to determine if Thelen's vehicle had a temporary tag. Doc. 85 at 5. The Government asserts that both officers testified that they did not see front plate, back plates or a temporary tag. *Id.* Thelen contends that

5

denying seeing a temporary tag is not the same as making efforts to determine whether her vehicle had a temporary tag. Doc. 86 at 2.

Thomas testified that he requested a traffic stop of what was later identified as Thelen's vehicle, noting that it did not have front or back license plates. Doc. 74 at 28. He testified that the lack of license plates "indicated to me that there was probable cause to stop that vehicle if it went mobile." *Id.* The Government then asked him if displaying a temporary plate was a permissible alternative to having front and back license plates. *Id.* Thomas stated that temporary tags were acceptable and noted that he did not see any when he drove by the vehicle. *Id.* However, he did not testify that he looked in the rear window or took any steps to determine whether a temporary tag was displayed. Based on the lack of testimony regarding any efforts Thomas made to examine Thelen's back window, the Government's objection is overruled as to Thomas.

Regarding Frederickson, he testified that he stopped Thelen because there were "no license plates on the vehicle." Doc. 74 at 43. He stated that although he understood that he was not permitted to stop a vehicle with a temporary tag for a compliance check, he stated that "[b]efore you pull someone over, you have to be able to see that . . . it is a temporary tag." *Id.* at 54. However, he did not testify that he looked for a temporary tag before he stopped Thelen, nor did he use the absence of a temporary tag as a justification for the traffic stop. In any event, he stated that he "couldn't see [the temporary tag] until we moved into the parking lot[.]" *Id.* at 45.

Frederickson's brief and limited view of Thelen's vehicle in the dark renders any claim that he checked for a temporary plate implausible. When Frederickson turned his car around to follow Thelen's vehicle, her vehicle was at least 100 feet away—only the vehicle's taillights were visible. *See* Doc. 46-4, Ex. C. at 00:22. From my review of Frederickson's dash camera video, the earliest that he could have seen that Thelen's vehicle did not have rear plates was at 00:37, although the glare from the headlights of other cars in the McDonalds parking lot makes it difficult to say for certain. *Id.* at 00:37. By 00:40, the dash camera footage clearly shows that Thelen's vehicle does not have rear

6

plates. *Id.* at 00:40. Between 00:43-00:44, Thelen's car is out of view as she turns into McDonalds and Frederickson initiated his emergency lights at 00:44. *Id.* at 00:44.

To detect the presence of a temporary tag, an officer would need to be at least as close to the vehicle when observing the absence of a rear license plate—if not closer. In this case, Frederickson followed Thelen's vehicle closely enough to potentially observe the rear for no more than seven seconds before activating his lights. Arguably, the temporary tag would not have been visible until Frederickson was much closer to Thelen's vehicle (around 00:41), three seconds before he activated his lights. During that brief window, Thelen's vehicle was out of view of the dash camera for at least one second, leaving at most two seconds of visibility. This limited and interrupted view undermines any credible claim that Frederickson looked for a temporary tag and determined that one was not present.

Additionally, it does not appear that Frederickson made any attempts to determine if Thelen had a temporary tag between the time he activated his emergency lights and when she pulled over. After he initiated his emergency lights at 00:44, Thelen's back window was almost entirely outside of the dash camera video as she came to a stop. There was no pursuit, as her vehicle stopped immediately after Frederickson initiated his lights, further limiting any opportunity for him to check for a temporary tag. Moreover, Frederickson did not assert that a lack of a temporary tag was a reason for initiating the traffic stop – only that she did not have license plates. Doc. 74 at 43. Given the fact that it was dark, Frederickson would have needed to follow Thelen's vehicle for more than a few seconds at a close distance to credibly claim that he looked for a temporary tag. I therefore find that Frederickson, like Thomas, did not make any efforts to determine if there was a temporary tag on Thelen's vehicle. The Government's fifth objection is overruled.

Sixth, the Government requests a finding that a "rectangular object in the rear window" cannot be seen in Thelen's rear window until after the traffic stop when both cars are stopped under the McDonalds parking lot overhead lights. Doc. 85 at 5. From

7

my review of Frederickson's dash cam video (Doc. 46-4, Ex. C), I agree with the Government. The "rectangular object" – what is later determined to be a (fraudulent) temporary tag— is not visible until approximately 00:58 of Exhibit C. At that point, Frederickson's headlights, Thelen's taillights and the lights in the McDonald's parking lot were all on. Therefore, the Government's objection is sustained.

Seventh, the Government requests a finding that Frederickson initiated his emergency lights to stop Thelen's vehicle when he was about one to two car lengths behind her car—what it states to be approximately 00:43-00:44 of Exhibit C. Doc. 85 at 6. Judge Mahoney found that Frederickson activated his emergency lights to initiate the traffic stop at 00:44 of Exhibit C. Doc. 77 at 4. I agree with the Government that at 00:44, Officer Frederickson is approximately one to two car lengths away from Thelen's vehicle. The Government's request for a finding that Frederickson's lights were initiated at 00:44 is redundant as Judge Mahoney made its requested finding. The Government's objection is sustained as to the space between the two vehicles when Officer Frederickson initiated his emergency lights.

Next, the Government requests that I find that Frederickson "sees/determines there is a temporary tag/paper plate in the rear window of the vehicle" when he pauses on his way to the driver's window (approximately 1:13-1:18 of Exhibit C). Doc. 85 at 6. The Government correctly notes that Frederickson shined his flashlight on Thelen's vehicle's rear window where the temporary tag was located at 1:13-1:18 of Exhibit C. This is the first time Frederickson read the contents of the temporary tag. I have already found that a "rectangular object" was visible in Thelen's rear window at 00:58 of Exhibit C. At that point, Frederickson acknowledged that it could have been a temporary tag but stated that all he could see was the "silhouette of a rectangle." Doc. 74 at 65. As such, the Government's objection is sustained. Frederickson shined his flashlight in Thelen's back window from 1:13-1:18 of Exhibit C and at that time, he could read the temporary tag.

Finally, the Government objects to Judge Mahoney's conclusion about the Sioux City Police Department training. Doc. 85 at 6-8. Judge Mahoney wrote:

8

[I]t appears to the court that Sioux City police officers may be trained that they can perform a traffic stop any time they are unable to read the information on a temporary tag. It seems the officers understood Iowa law to require them to be able to see and read a temporary tag from some distance away.

Doc. 77 at 12. Thelen argues that the testimony of Officer Church, Detective Thomas and Officer Frederickson supports Judge Mahoney's conclusion. Doc. 86 at 3.

I agree with Judge Mahoney. Church testified that based on her training and experience when a temporary tag cannot be clearly read it creates "probable cause to make a stop and confirm the validity of it." Doc. 74 at 21-22. Additionally, Thomas testified that a "paper tag has to be clearly visible by Iowa state law." *Id.* at 33. Although Frederickson stated that officers are not permitted to conduct "a compliance check any time [they] see a temporary tag," he testified that "you have to be able to see that – at the very least that it is a temporary tag." *Id.* at 54. Based on the officers' testimony, I agree that the Sioux City Police Officers have either been trained, or at least have otherwise developed an understanding, that they must be able to read a temporary tag from a certain distance. As such, the Government's objection is overruled.

### 2. *Thelen's Objection to Findings of Fact*

Thelen objected to Judge Mahoney's factual finding that K-9 Gino positively indicated on her vehicle. Doc. 82 at 3-5. She argues that the irregularities in Gino's training and certification undermine his credibility and therefore his alert was not reliable. *Id.* at 4-5. The Government asserts that K-9 Gino positively indicated on Thelen's vehicle and that his reliability was established through certification, training records and the videos of his deployment on Thelen's vehicle. Doc. 85 at 3.

Courts examine the totality of the circumstances in determining a K-9's reliability. *See United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007); *see also Florida v. Harris*, 568 U.S. 237, 245 (2013) ("No more for dogs than for human informants is such an inflexible checklist the way to prove reliability. . .."). Courts consider a K-9's

9

training, certification and accuracy rate, among other things, in assessing its reliability. *See United States v. Collier*, 116 F.4th 756, 761 (8th Cir. 2024). Even if a K-9 is found to be reliable, "circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Florida*, 568 U.S. at 247. As such, the court must look at "all the facts surrounding a dog's alert." *Id.* at 248.

I agree with Judge Mahoney's finding that K-9 Gino positively indicated on Thelen's vehicle. "An 'indication' is a trained behavior that a K-9 will show that affirmatively indicates the presence of the odor of a drug." *United States v. Nelson*, No. 4:21-CR-40137-KES, 2022 WL 16734666, at *4 (D.S.D. Aug. 9, 2022), *report and recommendation adopted as modified*, No. 4:21-CR-40137-KES, 2022 WL 6700595 (D.S.D. Oct. 11, 2022). Officer Hansen testified that Gino's' trained final response is to "stare at a drug location until [he] give[s] him the command to be released." Doc. 74 at 83-84. Officer Hansen testified (and the video evidence supports) that Gino stared at the open window for 11 seconds. *Id.* at 83; *see also* Doc. 59-3, Ex. H 00:24-00:35.

Additionally, Hansen testified that he looks for "[t]hings such as head snaps as he's walking along the vehicle" and "[i]f he slows down and begins to stop" to determine if Gino alerted to the presence of drugs. *Id.* at 82-83. Although Hansen did not see it at the time, Gino's head shot up as he turned around—providing further evidence that Gino detected drugs in Thelen's vehicle. Doc. 74 at 82-83; Doc. 59-3, Ex. H at 00:18-00:19; *see United States v. Holleman*, 743 F.3d 1152, 1156 (8th Cir. 2014) ("[O]ur Fourth Amendment jurisprudence does not require drug dogs to abide by a specific and consistent code in signaling their sniffing of drugs to their handlers.") (quoting *United States v. Clayton*, 374 Fed. Appx. 497, 502 (5th Cir. 2010)).

Gino was certified through Dogs for Law Enforcement (DLE), which the Sioux City Police Department has used to certify K-9s since the early 2010s. Doc. 74 at 193. DLE requires a two-part certification – first, the odor recognition phase and then three practical phases: vehicle, building room and open area searches. *Id.* at 227. Although

10

defense expert Michael Gould contested DLE's legitimacy, Deputy Klein testified that DLE requires the national standard of 16 hours of training per month. *Id.* at 205. Gino broke his leg in May 2024, and therefore did not meet the required training hours that month. However, the evidence shows that Gino averaged 16 hours of training per month between February 2023 and January 2025. *Id.* at 205; Doc. 59-8; *United States v. Williams*, 684 F. Supp. 3d 923, 938–39 (N.D. Iowa 2023) ("Evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust [the dog's] alert.").

Finally, the parties dispute Gino's field accuracy rate. Thelen contends that Gino's field accuracy rate is around 55 percent. Doc. 59-13 at 4. Klein asserts that this calculation does not factor in situations in which Gino did not give a trained final response. Doc. 74 at 209-10. As such, the Government contends that his field accuracy rate is 76 percent. *Id.* at 209; Doc. 68-2 at 4. I agree that the situations in which Gino did not give a trained final response should be included in determining Gino's accuracy rate. In any case, the Eighth Circuit has held that "a trained dog's alert will establish probable cause when the dog's previous in-field accuracy rate exceeds 50 percent." *Collier*, 116 F.4th at 761 (collecting cases).

Gino received consistent training, aside from the time that his injury prevented him from doing so, was considered competent and certified by the DLE and both parties agree that his accuracy rate is over 50 percent. Considering the totality of the circumstances, I find that Gino positively indicated as to the presence of drugs within Thelen's vehicle. As such, Thelen's objection is overruled.

## B.    *Legal Objection*

The Government objects to Judge Mahoney's finding that the traffic stop was unlawful. Doc. 85 at 8-11. The Government argues that the facts here are distinguishable from Eighth Circuit precedent and asserts that there is "no authority which requires an officer to get bumper-close to a vehicle observed to have no license plates to see if the

11

vehicle has a temporary plate[.]" *Id.* at 10. Additionally, it argues that "even when Officer Frederickson caught up to defendant's vehicle and was within 1 to 2 car lengths, he could not see" a temporary tag. *Id.* at 11.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV. "A traffic stop constitutes a seizure for purposes of the Fourth Amendment and therefore must be supported by probable cause or reasonable suspicion." *United States v. Linnell*, 93 F.4th 1102, 1105 (8th Cir. 2024). Any "traffic violation— however minor—creates probable cause to stop the driver of a vehicle." *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quotations omitted). "Law enforcement officers are afforded 'substantial latitude in interpreting and drawing inferences from factual circumstances.'" *Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020) (quoting *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)). Indeed, "the evidence 'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'" *Linnell*, 93 F.4th at 1106 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Additionally, an officer's subjective motivations for initiating a traffic stop are irrelevant so long as the officer has an objectively reasonable basis to stop the vehicle. *See United States v. Williams,* 431 F.3d 296, 298 (8th Cir. 2005) ("A traffic stop is constitutional, regardless of the officer's subjective intent, if the officer had probable cause to believe a traffic violation occurred."); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

Here, Frederickson stated that he stopped Thelen because there were "no license plates on the vehicle," which he asserts provided probable cause. Doc. 74 at 43. Judge Mahoney summarized Iowa law on temporary tags as follows:

> Generally, Iowa law requires that vehicles display front and rear metal plates in a "clearly visible" position and be maintained free of debris so they are "clearly legible," with the rear plate illuminated so that it is "clearly legible from" fifty feet away. These rules do not apply, however,

12

to newly purchased vehicles, which may instead display a temporary "card" (provided by the state) "on the rear of the vehicle" for forty-five days; the card must be "plainly stamped or stenciled" with the dealer's registration number and date of the vehicle's delivery.

Doc. 77 at 11 (citing Iowa Code §§ 321.37(1), 321.166(1)(a), (4), 321.38, 321.388, 321.25) (footnotes omitted). She further found:

This tracks as a matter of common sense. If a temporary paper tag were displayed on the vehicle's bumper in the spot normally used for a metal plate, allowing it to be illuminated so that it could be read from a distance at night, it would likely disintegrate; a paper tag is not going to withstand weather. It would also be illogical to require a new vehicle owner to construct a light "to illuminate the rear window of a vehicle" when "most temporary tags are just that—temporary." In addition, here, the officers' testimony supports that temporary tags in Iowa are commonly displayed in a vehicle's rear window and that it is not unusual to be unable to read a temporary tag due to the time of day, weather, window tint, or dirty windows.

Doc. 77 at 12-13 (footnotes omitted). I agree with Judge Mahoney's conclusions. She correctly summarized Iowa's law on temporary tags and the reasoning behind this exception to the typical licensure requirements.

### 1.    *Relevant Caselaw*

The Supreme Court and the Eighth Circuit have addressed the permissibility of police officers stopping a vehicle for a temporary tag violation. "To stop a driver for a suspected temporary-tag violation, police must have 'articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered.'" *Clinton v. Garrett*, 49 F.4th 1132, 1140 (8th Cir. 2022) (quoting *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)). Indeed, "[t]he Fourth Amendment does not allow a policeman to stop a car just because it has temporary tags." *United States v. McLemore*, 887 F.3d 861, 867 (8th Cir. 2018); *see also Clinton*, 49 F.4th at 1140 ("[T]he Fourth Amendment does not permit random 'spot checks.") (quoting *Delaware*, 440 U.S. at 661). "A determination that

13

reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *United States v. Givens*, 763 F.3d 987, 991 (8th Cir. 2014) (citation omitted).

Additionally, "[e]ven an officer's incomplete initial observations may give reasonable suspicion for a traffic stop." *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) (citing *United States v. Smart*, 393 F.3d 767, 770-71 (8th Cir. 2005). "Mistakes of law or fact, if objectively reasonable, may still justify a valid stop." *Id.*; *see also United States v. Herrera–Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007) ("Even if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an 'objectively reasonable one.'") (citation omitted). The Eighth Circuit has a robust body of caselaw regarding the permissibility of police pulling over vehicles for alleged vehicle registration violations.

### a. Officers Could See Temporary Tag Before Stop, Cannot Read It

When officers can see that a vehicle has a temporary tag but cannot read it, the Eighth Circuit has held that it *might* be permissible for them to stop the vehicle. In *Givens*, the court held that an officer lawfully conducted a traffic stop when he could see a "paper affixed to the rear window," but could not determine whether it was a valid temporary registration card. *Givens*, 765 F.3d at 990. The officer testified as to his own experience that "temporary registration cards are generally legible when observed from his patrol car" at night. *Id*. Based on this testimony, the court found that "it was objectively reasonable for [the officer] to expect that a properly displayed valid registration would be readable from his location." *Id.*

On the other hand, the Eighth Circuit has held that police officers cannot stop a vehicle simply because they are unable to read information on a temporary tag. In *Clinton*, the court found that the officers did not have reasonable suspicion to stop a vehicle when they were able to see a paper tag in the rear window of the vehicle but could not determine what was written on the tag. *See Clinton v. Garrett*, 551 F. Supp. 3d 929, 942 (S.D. Iowa 2021), *aff'd*, 49 F.4th 1132 (8th Cir. 2022). The court noted

14

that although the "contents of the tag were not readily apparent from driving distance," the "document was visible and unmistakably affixed to the rear window of the vehicle, in compliance with Iowa law." *Clinton*, 551 F. Supp. 3d at 942. The court held that unlike in *Givens*, where the court found the officers "acted reasonably when stopping a vehicle with an illegible temporary tag because the officer believed a *valid* registration tag *could* be read from the squad car in similar conditions," the officers in *Clinton* testified that whether a temporary tag could be read from the squad car "depend[ed] on the situation." *Id.* at 943 (citing *Givens*, 763 F.3d 987) (emphasis in original). Indeed, the officers failed to make "any correlation between the legibility of Clinton's temporary tag and its authenticity." *Id.*

Similarly, in *United States v. McLemore*, 887 F.3d 861 (8th Cir. 2018), the officer observed that the defendant's vehicle had a temporary plate, but the officer was unable to read it. *Id.* at 863. The court held that the inability to read a temporary tag from a police car, without more, is not enough to provide reasonable suspicion. *Id.* at 865. In *McLemore*, the officers did not identify what information they could not see and neither of the officers "testified that they can usually read temporary cards at night or that they had previous problems with fraudulent or invalid cards." *Id.* at 866.

### b. Officers Could See Temporary Tag Before Stop, Identify Irregularity

The Eighth Circuit has held that reasonable suspicion is satisfied when an officer is able to identify irregularities with a temporary or permanent tag. *See United States v. Mendoza*, 691 F.3d 954, 959 (8th Cir. 2012) (Officer had reasonable suspicion to believe a vehicle did not display proof of vehicle registration when "observing it from a distance of fifteen to twenty feet, she was unable to identify an issuing State" and there were "large, handwritten block numbers" which "[i]n her experience. . . could be used to alter a date[.]"); *see United States v. Sanchez*, 572 F.3d 475, 477-78 (8th Cir. 2009) ("[I]t was objectively reasonable for [the officer] to suspect at the time of the stop that the paper

15

affixed to the rear of the minivan was not an official registration document from another State" as he could not "discern the name of any issuing state[.]"); *see also United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005) (Officer "had an objectively reasonable basis" to stop the defendant because he could not determine "what state had issued the [rear] plate[.]").

### c. *Officers Could Not See Temporary Tag Before Stop*

The Eighth Circuit has held that officers are permitted to initiate a traffic stop when they do not "see any plates or stickers," even if the car had a valid temporary tag. *United States v. Hollins*, 685 F.3d 703, 707 (8th Cir. 2012). In the district court proceedings in *Hollins*, the Magistrate Judge stated that "[t]he officers observed that the SUV had neither front nor rear license plates and, believing this to be a traffic violation, they decided to stop the SUV." *United States v. Hollins*, No. 8:10CR447, 2011 WL 2161350, at *1 (D. Neb. Apr. 8, 2011), *report and recommendation adopted*, No. 8:10CR447, 2011 WL 2161357 (D. Neb. June 2, 2011), *aff'd*, 685 F.3d 703 (8th Cir. 2012). After the police officer "activated the emergency lights," he "pursued the SUV." *Id.* During the pursuit, the defendant's SUV was "between 20 and 40 feet in front of the police cruiser," but the officer could not see a temporary tag on the vehicle. *Id.* Indeed, the Eighth Circuit noted, "[o]nly after shining his spotlight, exiting his car, and approaching the SUV did [the officer] see the In Transit sticker. Even then, it was not immediately verifiable as a valid sticker." *Hollins*, 685 F.3d at 707. Although the vehicle's "In Transit sticker" satisfied the temporary tag laws in Nebraska, the court nonetheless held that the officers had reasonable suspicion to justify the traffic stop. *Id.* at 706.

The Eighth Circuit has also held that reasonable suspicion is satisfied when a vehicle does not have license plates and "the dark tint of the rear window" prevented an officer from seeing a temporary tag. *See United States v. Peltier*, 217 F.3d 608, 609-10 (8th Cir. 2000) (noting that "[t]he uncontradicted evidence in the record establishes that,

16

when the deputy stopped [the defendant's] truck, he could not see the registration application because of the darkly tinted rear window[]"); *see also Givens*, 763 F.3d at 990 ("It is not uncommon for officers to stop vehicles due to the lack of an apparent temporary registration tag, and such stops are generally upheld as supported by reasonable suspicion.").[1]  Nonetheless, an officer cannot purposefully avoid looking at the back of a vehicle where temporary plates might be located.  *See United States v. Wise*, 418 F. Supp. 2d 1100, 1106 (S.D. Iowa 2006) (finding a traffic stop unlawful where an officer "willfully ignored making observations that would have avoided the stop" by failing to look for a temporary tag).

### 2.    *Application*

The Fourth Amendment requires that an officer have reasonable suspicion based on specific, articulable facts that a traffic violation occurred.  Detective Thomas requested that one of his officers conduct a traffic stop on Thelen's vehicle, "if probable cause could be developed," (Doc. 74 at 32) as the vehicle was observed near a drug trafficking target's residence, and it did not have license plates.[2]  An officer's subjective motivations for pulling a vehicle over are immaterial so long as there is a traffic violation.  *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) ("Any traffic violation, however minor, provides probable cause for a traffic stop."); *United States v. Rutledge*, 61 F.4th 597, 601 (8th Cir. 2023) ("[A] minor traffic violation provides probable cause for a traffic stop, even if it is mere pretext for a narcotics search.") (citation omitted).

---

[1] The Eighth Circuit cited *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006), as an example of this proposition.  In *Edgerton*, the court held that the officer properly initiated a traffic stop because he was not able to read the temporary tag "while following at a safe distance" and could not determine whether the document was a valid temporary tag.  438 F.3d at 1047-48.

[2] This statement by Thomas suggests that he believed that the lack of license plates alone was insufficient to initiate a traffic stop.

17

Officer Frederickson stated that he stopped Thelen's vehicle because it did not have front or back license plates in violation of Iowa law. Doc. 74 at 43. Not having front or back license plates is not a per se violation of Iowa law because a vehicle is permitted, as an alternative, to display temporary tags in its rear window for 45 days. Iowa Code § 321.25 (2025). Thomas and Frederickson testified that they did not see a temporary tag in Thelen's rear window. However, neither testified as to whether they actually looked for a tag in the vehicle's rear window. Doc. 74 at 32 (Thomas stating that "I was unable to see any temporary tags"); *id.* at 45 (Frederickson stating that he could not "see [a temporary tag] until we moved into the parking lot, and all I could see was it was just a rectangle"). Frederickson's dash camera video shows that at most seven seconds elapsed between the time that he might have been able to see that Thelen's vehicle did not have a rear license plate and when he initiated his emergency lights. *See* Ex. C at 00:37-00:44. Moreover, the rear window of Thelen's vehicle was out of view for almost the entirety of the time between when Officer Frederickson initiated his emergency lights and when Thelen's vehicle stopped. *Id.* at 00:44-00:57. He did not follow Thelen's vehicle from a "driving distance" for any period to try to determine if she had a temporary plate. *Clinton*, 551 F. Supp. 3d at 947. As such, I have already found that neither Thomas nor Frederickson checked for a temporary tag in Thelen's back window. *See supra* Section IV.A.1.

Without making any effort to determine whether a temporary tag was present—such as checking the rear window or following Thelen's vehicle—the absence of a license plate without checking for a temporary tag or plate is insufficient to create reasonable suspicion of a registration violation. Although a finding of reasonable suspicion "need not rule out the possibility of innocent conduct," *Givens*, 763 F.3d at 991, it does require "a particularized and objective basis for suspecting the particular person stopped of breaking the law." *McLemore*, 887 F.3d at 864 (citation omitted). Thus, even crediting Frederickson's testimony, his limited observations do not amount to reasonable suspicion under the Fourth Amendment.

18

Moreover, Thelen's vehicle did, in fact, have a temporary tag in the back window.[3] Therefore, Frederickson's reasonable suspicion calculation was based on a mistake of fact – that her vehicle did not have a temporary tag at all. Additionally, it appears from Frederickson's testimony that he understood Iowa law to require a temporary tag to be legible from some distance away. *See* Doc. 74 at 54 ("Before you pull somebody over, you have to be able to see that – at the very least that it is a temporary tag."). This is incorrect, as Iowa law requires only that temporary tags be "plainly stamped or stenciled." Iowa Code § 321.25 (2025). In any case, an officer's mistake may still justify a stop if it was objectively reasonable. *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005) ("[T]he validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one.").

As discussed above, Frederickson's mistake of fact resulted from his failure to follow Thelen's vehicle for any meaningful period and check the rear window, the location where temporary tags are permitted by law. Indeed, once Frederickson parked behind Thelen's vehicle, although the contents of the temporary tag were not readily apparent, "the document was visible and unmistakably affixed to the rear window" as required by Iowa law. *Clinton*, 551 F. Supp. 3d at 942.

The Government contends that the temporary plate was visible only with the combination of the lights in the McDonalds parking lot and the lights from both vehicles. Doc. 85 at 5. However, as Judge Mahoney noted, the street was also well-lit. Doc. 77 at 5 n.5. If Frederickson followed Thelen at a driving distance for any length of time on the well-lit street and looked at her rear window, he would have at least seen something resembling a temporary plate.

---

[3] The temporary tag displayed on Thelen's vehicle was later determined to be invalid. *See* Doc. 74 at 62.

Moreover, *Hollins* and *Peltier* are distinguishable. Like Frederickson, the officers in *Hollins* did not appear to check for a temporary tag before initiating their emergency lights. *Hollins*, 685 F.3d at 706; *see also Hollins*, 2011 WL 2161350, at *1. However, after the initiation of the emergency lights, the officers spent some period in pursuit of the defendant before he yielded.[4] During this "pursuit," the officers made the (mistaken) determination that the vehicle in question did not bear a "In Transit" sticker. *Id.* The Magistrate Judge noted that the defendant's vehicle was 20 and 40 feet in front of the officers during the pursuit and the officers did not see a temporary tag. *Id.*

Here, Frederickson did not follow Thelen's vehicle at a distance that would have allowed him to check to see if she had a temporary tag between the time that he initiated and completed the stop. After Fredrickson initiated his emergency lights, her vehicle's back window was almost entirely outside of the dash camera video as she came to a stop. Ex. C at 00:44-00:57. Unlike *Hollins*, there was no pursuit here, as the stop occurred immediately after Officer Frederickson initiated his emergency lights. *Cf. Edgerton*, 438 F.3d at 1047-48 (upholding a traffic stop when officers were not able to read a temporary

---

[4] The moment that police activate emergency lights is not a seizure under the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("[E]ither physical force. . . or, where that is absent, submission to the assertion of authority[]" must occur for a police encounter to be a seizure under the Fourth Amendment.) (emphasis omitted); *Brendlin v. California*, 551 U.S. 249, 254 (2007) ("[T]here is no seizure without actual submission[.]"). An officer must have reasonable suspicion at the time that a Fourth Amendment seizure occurs which, in this context, that is when a driver submits to the authority by pulling over. *See United States v. McCauley*, 548 F.3d 440, 444 (6th Cir. 2008) ("[W]e need only determine whether reasonable suspicion existed at the time appellant actually submitted[.]"); *see also United States v. Tapia*, No. CRIM. 10-350 DWF JJG, 2011 WL 1260082, at *3 (D. Minn. Mar. 2, 2011), *report and recommendation adopted*, No. CRIM. 10-350(1) DWF, 2011 WL 1260062 (D. Minn. Apr. 5, 2011), *aff'd*, 481 F. App'x 288 (8th Cir. 2012) (". . . there was a seizure. So the issue then becomes whether Meyer had reasonable, articulable suspicion at that time."). In *Hollins*, the police did not look for a temporary tag prior to activating emergency lights. However, at the point when the defendant was seized (when he pulled over), the officers had looked for a temporary tag.

tag "while following at a safe distance" and the officer "was not even able to determine whether the defendant's car had a temporary tag") (quotations omitted).[5]

Critically, Frederickson did not even attempt to use Thelen's lack of temporary tags as a justification for the stop, instead testifying that he initiated the stop because she did not have license plates. He did not indicate that he observed – or failed to observe – a temporary registration tag, nor did he reference any effort to verify whether such a tag was present. *See* Doc. 74 at 43 (responding "no license plates on the vehicle" when asked what his probable cause was to pull the vehicle over); *cf. Hollins*, 2011 WL 2161350, at *3 ("When the officers decided to stop the SUV. . . they reasonably believed that the SUV had neither license plates nor In Transit stickers.") *and Peltier*, 217 F.3d at 610 ("[D]eputy lawfully stopped Peltier because Peltier's truck had no license plates and the dark tint of the rear window prevented the deputy from seeing the temporary registration application."). As noted above, under Iowa law the absence of license plates, without any attempt to look for a temporary tag, is not enough to provide reasonable suspicion for a traffic stop.

Unlike *Peltier*, the dark tint of Thelen's back window did not prevent Officer Frederickson from seeing the presence of something that resembled a temporary tag in her back window. *See* Doc. 77 at 13 *and supra* Section IV.A.1 (affirming Judge Mahoney's factual finding that "[t]his is not a case where the officer's inability to see the tag was within the driver's control"). Frederickson did not follow Thelen's vehicle or position himself to view the rear window for any period of time—either before initiating his emergency lights or before Thelen's vehicle stopped and thus cannot credibly claim that the tint obstructed his view or that no tag was visible.

Further dissimilar to *Peltier*, once Fredrickson stopped behind Thelen's vehicle, he could see something that resembled a temporary tag in her back window. *Cf. Peltier*, 217 F.3d at 609 (noting that "when the deputy stopped Peltier's truck, he could not see

---

[5] This case was cited approvingly in *United States v. Givens*, 763 F.3d 987, 990 (8th Cir. 2014).

the registration application because of the darkly tinted rear window" and only "as the deputy walked toward Peltier's truck" could he see "the outline of what appeared to be a registration application"). Although the contents of the temporary tag were not readable when Frederickson's vehicle was parked behind Thelen, the inability to be able to read a temporary tag, without more, is not enough to amount to reasonable suspicion. *See, e.g.*, *McLemore*, 887 F.3d at 867 *and Clinton*, 49 F.4th at 1142-43; *cf. Sanchez*, 572 F.3d at 479.

Additionally, the Eighth Circuit has held that officers made an unreasonable mistake of law when they constructed the Iowa temporary tag requirement ("plainly stamped or stenciled") "as meaning information that can be read from a pursuing officer's police cruiser." *McLemore*, 887 F.3d at 867. Frederickson's statement that an officer must "be able to see that – at the very least that it is a temporary tag" (Doc. 74 at 54) suggests that he believed reasonable suspicion was satisfied by the fact that he was not able to read the temporary tag from his police vehicle. Such an interpretation is unreasonable.

As such, I find that Frederickson did not have a particularized and objective basis for suspecting that Thelen violated Iowa's registration laws. I disagree with the Government's contention that such a holding would place undue burden on law enforcement by requiring "an officer to get bumper-close to a vehicle observed to have no license plates to see if the vehicle has a temporary plate[.]" Doc. 85 at 10. Rather, an officer must at least make an attempt to look for a temporary tag in a vehicle's back window before stopping that vehicle for a vehicle registration violation.[6] The initial stop of Thelen's vehicle was not supported by reasonable suspicion and therefore violated the Fourth Amendment.

---

[6] Officer Frederickson offered no other basis to support a finding of reasonable suspicion for initiating the traffic stop.

### 3.    *Remedy*

"Evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, 'cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'"  *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The exclusionary rule applies to both the direct evidence gathered from a Fourth Amendment violation, as well as indirect evidence otherwise derived from the illegality. *United States v. Miller*, 11 F.4th 944, 954 (8th Cir. 2021).  However, "[a]s a judicially-created remedy, the exclusionary rule applies only where 'its remedial objectives are thought most efficaciously served,'" and its remedial objective is deterrence.  *United States v. Hamilton*, 591 F.3d 1017, 1028 (8th Cir. 2010) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)); *United States v. Scroggins*, 361 F.3d 1075, 1084 (8th Cir. 2004) ("The exclusionary rule's purpose is deterrence.").

Since the traffic stop is unlawful, typically it is appropriate to exclude evidence found during that stop.  However, the Government asserts that the inevitable discovery doctrine applies such that the evidence obtained should not be excluded.  Doc. 64-1 at 11-12.   Additionally, it asserts that Thelen's search incident to arrest, during which methamphetamine was seized, makes the exclusionary rule inapplicable to the methamphetamine found on her person.  Doc. 72 at 11 n.15.  Thelen argues that the inevitable discovery doctrine is not applicable as "[t]he government's position, that the evidence would have been discovered as a search incident to a lawful arrest, puts the cart before the horse and assumes that the initial stop of the vehicle was lawful."  Doc. 65 at 1-2.

The Eighth Circuit has held that:

The inevitable discovery doctrine . . . creates an exception to the exclusionary rule.  Under that doctrine, "the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively

23

pursuing a substantial, alternative line of investigation at the time of the constitutional violation.

*United States v. Smith*, 21 F.4th 510, 517 (8th Cir. 2021) (citation omitted).

The Government did not offer any justification for stopping Thelen's vehicle besides the lack of license plates. Doc. 74 at 22, 43. Because I have found that Officer Frederickson did not have reasonable suspicion, the search and discovery of Thelen's person and drugs are a direct result of the illegal stop. No evidence has been offered that there was a separate investigation underway (or that the officers had an alternative plan in mind) that would have led to the recovery of drugs. *See United States v. Baez*, 983 F.3d 1029, 1040 (8th Cir. 2020) ("[I]t [is] enough to constitute 'actively pursuing a substantial, alternative line of investigation' for officers to have in mind 'an alternative plan' that they would have executed if the constitutional violation had not occurred.").

Additionally, a lawful arrest is required for a valid search incident to arrest. Since Thelen's traffic stop was unlawful, an arrest stemming from that stop is also unlawful. *See United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001) ("If the investigatory stop is not justified by reasonable suspicion or if the investigating officers exceed the stop's proper scope, any evidence derived from the stop is inadmissible at trial."). As such, Thelen's search incident to arrest does not save the drugs discovered on her person. That evidence remains inadmissible. Therefore, the Government's arguments regarding the inevitable discovery doctrine and Thelen's search incident to arrest are inapplicable. Moreover, although I found that K-9 Gino positively indicated on Thelen's vehicle, it is unnecessary to address the propriety of the K-9 search because the traffic stop was unlawful.

Under the circumstances present here, I find that the appropriate remedy is to exclude the drug paraphernalia found in Thelen's car, the drugs found on her person and the statements she made to officers on the scene. *See Riesselman*, 646 F.3d at 1079 ("[V]erbal statements obtained as a result of a Fourth Amendment violation are as much

subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.") (citation omitted).

## V.     CONCLUSION

For the reasons set for herein:

1.     The Government's factual objections (Doc. 85) to the Report and Recommendation (Doc. 77) are **sustained in part** and **overruled in part**, as set forth in this order.

2.     The Government's legal objection (Doc. 85) to the Report and Recommendation (Doc. 77) is **overruled**.

3.     Thelen's objection (Doc. 82) to the Report and Recommendation (Doc. 77) is **overruled**.

3.     The Report and Recommendation (Doc. 77) is hereby **accepted**, as modified herein.

4.     Thelen's motion (Doc. 46) to suppress is **granted**.

**IT IS SO ORDERED** this 22nd day of July, 2025.

_____
Leonard T. Strand
United States District Judge